#26917, #26918, #26965, #26993-aff in pt, rev in pt & rem-GAS
**2015 S.D. 44**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

(#26917, #26918)

STANLEY E. STABLER,
ROSE MARIE STABLER,
BRAD A. STABLER and
BRENDA L. STABLER                    Plaintiffs and Appellants,

      v.

FIRST STATE BANK OF ROSCOE
a South Dakota Corporation
and JOHN R. BEYERS,                    Defendants and Appellees.

_____

(#26965, #26993)

STANLEY E. STABLER,
ROSE MARIE STABLER,
BRAD A. STABLER and
BRENDA L. STABLER,                    Plaintiffs and Appellees,

      v.

FIRST STATE BANK OF ROSCOE
a South Dakota Corporation
and JOHN R. BEYERS,                    Defendants and Appellants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
MCPHERSON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE SCOTT P. MYREN
Judge

* * * *

ARGUED ON BRIEFS
ON NOVEMBER 17, 2014
OPINION FILED **06/10/15**

LEE SCHOENBECK
Watertown, South Dakota

    and

PATRICK T. DOUGHERTY of
Dougherty & Dougherty, LLP
Sioux Falls, South Dakota

Attorneys for plaintiffs
and appellants in appeal
#26917 and for plaintiffs and
appellees in appeal #26965.


ROGER W. DAMGAARD
SANDER J. MOREHEAD of
Woods, Fuller, Shultz & Smith, PC
Sioux Falls, South Dakota

Attorneys for defendants
and appellees in appeal #26917
and for defendants and
appellants in appeal #26965.

#26917, #26918, #26965, #26993

SEVERSON, Justice

[¶1.]     In 2007, Stablers brought fraud actions against the First State Bank of Roscoe (FSB) and its president at the time, John Beyers. They alleged that FSB and Beyers conspired to induce Stablers to sign notes and mortgages to pay debt that had been discharged due to bankruptcy. The circuit court rescinded one note and mortgage as to Brad and Brenda Stabler and allowed another note with a third-party bank to be enforced against them. A jury found that FSB and Beyers fraudulently induced Brad's parents, Stan and Rose, to sign a promissory note and collateral real estate mortgage. Both sides are appealing the judgment of the circuit court with respect to multiple transactions that they engaged in over the years.

**Background**

[¶2.]     This suit involves four members of the Stabler family. Stan and Rose Stabler are the parents of Brad, who is married to Brenda. The four Stablers will sometimes be collectively referred to as "Plaintiffs." Brad and Brenda incorporated Edmunds County Ag Services, Inc., (ECAS) in 1999, a business that provided services to farmers. As part of the startup funding for the business, they borrowed money from FSB, whose president at the time was John Beyers. FSB and Beyers are sometimes referred to collectively throughout this opinion as "Defendants." To secure the debt, FSB took liens on property along with a personal guarantee by Brad. In 2000, Stan and Rose also executed a mortgage in favor of FSB to secure ECAS debt. (The 2000 Mortgage.) *See infra* ¶ 5, Transaction 1. The mortgage secured a loan for an ECAS building that was being erected on Stan and Rose's property. The mortgage covered the quarter of land where the building was being

-1-

built. Throughout the course of FSB and Stablers' business relationship, the parties entered into numerous other financial arrangements. Not all of these transactions concerned ECAS; some were for Stablers' personal and separate businesses. ECAS liquidated in May 2002 and paid FSB the proceeds from its property; however, it still owed FSB roughly $350,000. FSB had the option at that time to foreclose on the 2000 Mortgage or call on Brad's guaranty, but did not do so. In July 2002, Stan and Rose executed a collateral real estate mortgage (CREM) that provided security for some of the remaining debt, part of which is disputed. (The 2002 CREM.) *See infra* ¶ 5, Transaction 2.

[¶3.]     Brad and Brenda subsequently went through bankruptcy in 2003. The bankruptcy discharged Brad's personal guaranty of the ECAS loans, but the liens were not discharged by bankruptcy.[1] FSB still held liens and the option to foreclose to recover the debt secured by the 2000 Mortgage and the 2002 CREM. In November 2003, after the bankruptcy was completed, Brad signed a promissory note that refinanced previous obligations. *See infra* ¶ 5, Transaction 3. Stan also signed a promissory note in November 2003. *See infra* ¶ 5, Transaction 4. John Beyers then sought out all four Stablers to sign a $650,000 note and CREM in 2004 that repackaged debt of Brad, Brenda, ECAS, Stan, and Rose. (The 2004 Transaction.) *See infra* ¶ 5, Transaction 5. The bank represented that the debt in the 2004 Transaction included Brad and Stan's debt. The circuit court recited that

---

1.     Stablers mention that their bankruptcy attorney failed to list debt on their bankruptcy schedules. Although the attorney representing them in Bankruptcy, who is also FSB's attorney, failed to list ECAS debt, the trial court explained that Brad's guarantee of this debt was still discharged.

this was an elaborate scheme to defraud Stablers.  The 2004 Transaction was the exact same amount and in the same form of debt as existed prior to Brad and Brenda's bankruptcy.

[¶4.]        Remaining at FSB was approximately $150,000 of Brad and Brenda's debt, which was paid off in early February 2005 with a loan to Brad and Brenda from the Ipswich State Bank (ISB note).  *See infra* ¶ 5, Transaction 6.  Beyers induced ISB to loan $150,000 to Brad and Brenda.  The circuit court found that Beyers falsified financial records and personally guaranteed the loan to convince ISB to extend a loan to Brad and Brenda.  The proceeds from this loan went to FSB, but it is still disputed whether the proceeds paid off valid liens or reaffirmed discharged debt.  Brad and Brenda eventually defaulted on the note, so Beyers, as guarantor, paid ISB the remaining balance and took an assignment of the note.  Brad and Brenda started a bankruptcy court action to stop Beyer's collection on the note, alleging that it was in violation of the post-discharge injunction.[2]  *See Stabler*

_____

2.     11 U.S.C. § 524(a) provides that bankruptcy discharge:

> (1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived;
>
> (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and
>
> (3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the

(continued . . .)

*v. Beyers* (*In re Stabler*), Bankr. No. 03-10179, Adv. No. 09-1002, 2009 WL 1651441 (Bankr. D.S.D. June 11, 2009), *aff'd*, 418 B.R. 764 (B.A.P. 8th Cir. 2009). "The bankruptcy court dismissed the adversary proceeding based on the application of collateral estoppel to a prior state-court judgment and on a determination that permissive abstention was warranted under 28 U.S.C. § 1334(c)(1)." *In re Stabler*, 418 B.R. at 766. In state circuit court, Brad and Brenda elected to rescind in accordance with SDCL 53-11-2(1).[3] The circuit court held that they had not met

_____

( . . . continued)

> debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case, on account of any allowable community claim, except a community claim that is excepted from discharge under section 523, 1228(a)(1), or 1328(a)(1), or that would be so excepted, determined in accordance with the provisions of sections 523(c) and 523(d) of this title, in a case concerning the debtor's spouse commenced on the date of the filing of the petition in the case concerning the debtor, whether or not discharge of the debt based on such community claim is waived.

3. SDCL 53-11-2 provides:

> A party to a contract may rescind the same in the following cases only:
>
> (1) If consent of the party rescinding or of any party jointly contracting with him was given by mistake or obtained through duress, fraud, or undue influence exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party;
>
> (2) If through fault of the party as to whom he rescinds, the consideration for his obligation fails in whole or in part;
>
> (3) If the consideration becomes entirely void from any cause;
> (4) If such consideration before it is rendered to him fails in a material respect from any cause; or
>
> (5) By consent of all the other parties.

their burden under SDCL 53-11-2(1) to show that their consent was given by "mistake or obtained through duress, fraud, or undue influence exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party[.]" The court noted that if ISB were trying to collect on the note, nothing would prevent it from doing so and, because Beyers, as assignee, has the rights of ISB, he is entitled to enforce the note against Brad and Brenda.

[¶5.]     Relevant to this lawsuit are the following Transactions:

(1)     Signed in April 2000, a $200,000 promissory note by ECAS to FSB, secured by ECAS property, Brad's personal guaranty, and a real estate mortgage on Stan and Rose's property, loan #45210. (The 2000 Mortgage)

(2)     Signed in July 2002, a collateral real estate mortgage for $300,000 on Stan and Rose's property to provide additional security on ECAS debt. (2002 CREM)

  a.     This 2002 CREM secured six obligations[4]:

    i.     $200,000.00 promissory note of ECAS due December 15, 2013, Loan #45210.

    ii.     $122,221.50 ECAS's promissory note due August 1, 2002.

    iii.     $105,400.00 ECAS's promissory note due September 1, 2002, loan #46575.

    iv.     $70,000.00 Brad's promissory note due April 14, 2000.

    v.     $195,328.17 Brad's promissory note due October 1, 2002, loan #46576.

    vi.     $75,000.00 Stan's promissory note due July 15, 2003, loan #46601.

---

4.     The Stablers contested whether the 2002 CREM appropriately secured the obligations listed, but upon the incorporation of the 2002 debt into the 2004 Transaction, the issue was subsumed in the 2004 Transaction issues.

(3) Loan #47365, *see infra* (5)(a)(iv), signed November 17, 2003,[5] a promissory note to FSB by Brad for $196,861.67, secured by the 2002 CREM.

(4) Loan #47367, *see infra* (5)(a)(vi), signed November 18, 2003, a promissory note to FSB by Stan and Rose for $186,000 "Farm Operating Renewal."

(5) Signed in March 2004, a promissory note for $650,000 by Brad, Brenda, Stan, and Rose, secured by a CREM on substantially all Stablers' real property and a lien on substantially all their personal property. (2004 Transaction)[6]

    a. The note refinanced various obligations. After refinancing, the CREM secured the following[7]:

        i. $266,000 ECAS Loan #47124.

        ii. $110,900 ECAS Loan #45210.

        iii. $39,100 Stabler Farm Loan #46952.[8]

        iv. $132,990 Stabler Farm Loan #47365.[9]

        v. $1,010 Stabler Farm Loan #47563.

        vi. $100,000 Stan Stabler Farm Loan #47367.[10]

---

5. This note was executed post-bankruptcy discharge of Brad and Brenda's personal obligations on the debt they had with FSB.

6. The 2004 Transaction was initially divided and assigned to independent parties—Roger Ernst (individual) in the amount of $213,000, Schurrs (a partnership) in the amount of $416,000, and H&K Acres, LLC, in the amount of $21,000. H&K Acres, LLC, was paid by Brad and Brenda, eliminating that obligation. The other two assignments were eventually assigned to Beyers in 2008.

7. Beyers alleged multiple of these loans were ones previously secured by the 2000 Mortgage, or the 2002 CREM, or both.

8. By the note's terms, it is a renewal of loan #46576, *see supra* Transaction 2(a)(v), secured by the 2000 Mortgage and the 2002 CREM.

9. A refinance of the promissory note signed by Brad in November 2003. *See supra* Transaction 3.

10. A refinance of the promissory note signed by Stan and Rose in November 2003. *See supra* Transaction 4.

(6)     February 9, 2005, promissory note to Ipswich State Bank
        in the principal amount of $150,000.  Beyers  guaranteed
        this loan and subsequently took an     assignment of it on
        July 3, 2007.  (ISB note).

[¶6.]     The 2004 Transaction is the main subject of this litigation.  *See supra* ¶ 5, Transaction 5.  In circuit court, Brad and Brenda claimed it was an invalid reaffirmation of debt discharged in bankruptcy.  Stan and Rose claimed Beyers knowingly misrepresented that Brad and Brenda owed amounts contained in the 2004 Transaction.

[¶7.]     Under the Bankruptcy Code, a post-bankruptcy agreement to pay dischargeable debt between the holder of a claim and the debtor, known as a reaffirmation agreement, must meet specific requirements.  11 U.S.C. § 524(c) (2012).[11]  Therefore, any agreement that Brad and Brenda entered into with FSB

---

11.     11 U.S.C. § 524(c) states:

> **(c)** An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if--
>
>> **(1)** such agreement was made before the granting of the discharge under section 727, 1141, 1228, or 1328 of this title;
>>
>> **(2)** the debtor received the disclosures described in subsection (k) at or before the time at which the debtor signed the agreement;
>>
>> **(3)** such agreement has been filed with the court and, if applicable, accompanied by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that--

(continued . . .)

after their bankruptcy, "the consideration for which, in whole or in part, is based on a debt that is dischargeable[,]" needed to be filed with the bankruptcy court. *Id.* It is undisputed that FSB did not follow that procedure. Therefore, all four of the Stablers instigated this lawsuit alleging that the bank and Beyers misrepresented to Stan and Rose that $550,000 in the 2004 Transaction was Brad's debt, when in fact Brad did not owe that debt because the bank did not follow the proper procedure to reaffirm his debt with the bank. FSB and Beyers responded that an agreement by a holder of a claim to not foreclose its interest (on liens that pass through bankruptcy unaffected) is new consideration to support a post-bankruptcy agreement without the intervention of the bankruptcy court. Further, Defendants alleged that when Stablers instigated this suit in 2007, there was a split of authority across the nation on the enforceability of the type of agreement that Brad signed in this litigation. *Compare Shields v. Stangler (In re Stangler)*, 186 B.R. 460, 464 (Bankr. D. Minn. 1995), *and Minister State Bank v. Heirholzer (In re Heirholzer)*, 170 B.R. 938, 941 (Bankr. N.D. Ohio 1994), *with In re Zarro*, 268 B.R.

---

( . . . continued)

**(A)** such agreement represents a fully informed and voluntary agreement by the debtor;

**(B)** such agreement does not impose an undue hardship on the debtor or a dependent of the debtor; and

**(C)** the attorney fully advised the debtor of the legal effect and consequences of--

    **(i)** an agreement of the kind specified in this subsection; and

    **(ii)** any default under such an agreement . . . .

-8-

715, 722 (Bankr. S.D.N.Y. 2001), *In re Arnold*, 206 B.R. 560, 563 (Bankr. N.D. Ala. 1997), *and In re Gardner*, 57 B.R. 609, 610 (Bankr. D. Me. 1986). The circuit court ultimately held that this agreement was an invalid reaffirmation. Therefore it granted Brad and Brenda rescission on the 2004 Transaction, which had been reduced to roughly $629,000 due to payments by Brad and Brenda.

[¶8.] Stan and Rose are in a different position with regard to the 2004 Transaction. They were not debtors in the 2003 bankruptcy. Therefore, the reaffirmation procedure in the Bankruptcy Code is not applicable to them. Instead, they alleged fraud based on the theory that Defendants knowingly misrepresented to Stan and Rose that Brad and Brenda owed amounts contained in the 2004 Transaction and Defendants thereby fraudulently induced Stan and Rose to enter into the agreement, guarantying Brad's discharged debt that they otherwise would not have guaranteed.

[¶9.] Throughout a series of summary judgment and pre-trial hearings, Stan and Rose elected to affirm the 2004 Transaction and sue for damages caused by the alleged fraud perpetrated upon them. The circuit court issued a memorandum decision on the parties' motions for summary judgment on February 3, 2011. It held the obligations secured by the 2000 Mortgage and the 2002 CREM were discharged by execution of the 2004 Transaction. Accordingly, on summary judgment motion by Stan and Rose, it dismissed Beyers' counterclaims for foreclosure against Stan and Rose on the basis of either the 2000 Mortgage or the 2002 CREM, which allegedly secured some of the same obligations. It further held that the 2002 CREM had partially lapsed due to a failure to timely file addendums according to SDCL

44-8-26. The court limited Stan and Rose to seeking damages at the jury trial, stating that they could not rescind the 2004 Transaction. At trial, the question of fraud went to the jury, which decided that $439,100 of the 2004 Transaction was procured by fraud. The court entered a judgment declaring $439,100 uncollectible. This resulted in an enforceable amount of $210,900. The jury also awarded $20,000 exemplary damages to Stan and Rose, but the circuit court dismissed those as not supported by a compensatory damage award.

[¶10.]     The parties appeal, raising the following issues:

1.     Whether FSB and Beyers were entitled to judgment as a matter of law on Stablers' fraud claims and Beyers' counterclaims.

2.     Whether Stan and Rose should have been allowed to pursue emotional distress damages as part of the fraud and conspiracy claims against Beyers and FSB.

3.     Whether Stan and Rose's $20,000 exemplary damage verdict should be upheld.

4.     Whether the 2004 CREM lapsed because the 2009 addendum was not signed by the mortgagee Beyers.

5.     Whether the 2002 CREM lapsed.

6.     Whether Beyers is a holder in due course of the ISB promissory note.

7.     Whether Beyers and FSB are entitled to their attorneys' fees and costs for work done in bankruptcy court.

8.     Whether FSB and Beyers are entitled to a new trial.

**Analysis**

*Issues relating to the $650,000 promissory note and CREM (the 2004 Transaction)*

1.     *Whether FSB and Beyers were entitled to judgment as a matter of law on Stablers' fraud claims and Beyers's counterclaims.*

[¶11.]     FSB and Beyers moved for summary judgment and argued at a hearing on November 27, 2012, that any representation made by Defendants was as to a legal issue and that there could not be actionable fraud because fraud requires a misrepresentation of fact. The court denied their motion. "When reviewing summary judgment, 'we determine only whether a genuine issue of material fact exists and whether the law was applied correctly.'" *Hoaas v. Griffiths*, 2006 S.D. 27, ¶ 11, 714 N.W.2d 61, 65 (quoting *Wulf v. Senst*, 2003 S.D. 105, ¶ 19, 669 N.W.2d 135, 142). "The moving party bears the burden of proving that no such issues [of material fact] exist." *Id.* "[T]he nonmoving party must set forth specific facts which show the existence of genuine issues of material fact." *Id.*

a.     *Actions for fraudulent inducement to enter a contract*

[¶12.]     In order to determine the issues the parties have presented, we must address the nature of the action brought. Claims of fraudulent inducement to enter a contract can arise under either tort or contract law. *See* SDCL 20-10-2 (Tort);[12]

---

12.     SDCL 20-10-2 provides:

A deceit within the meaning of § 20-10-1 is either:

(1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

(3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing.

SDCL 53-4-5 (Contract);[13] *Rist v. Karlen*, 90 S.D. 426, 430, 241 N.W.2d 717, 719 (1976) ("[T]he provisions of [SDCL 20-10-1 and 20-10-2] are declaratory of the common law and comprehend an intention to mislead."). The parties dispute the nature of this action. Although the codified elements of fraud under both areas of law are similar, a distinction arises in the remedies one may seek based on the action brought.

[¶13.] As we have previously explained, when a plaintiff is defrauded, he may bring a tort action or contract action based on the same facts. But when the remedies result in double recovery, he must elect the remedy. "He may affirm the contract and bring a tort action for deceit [seeking monetary damages], or he may repudiate the contract and bring a contract action for rescission or revision." *Aschoff v. Mobil Oil Corp.*, 261 N.W. 2d 120, 123 (S.D. 1977) (citing William L. Prosser, *Handbook of the Law of Torts* 683-736 (4th ed. 1971); Samuel Williston, *A*

---

13. SDCL 53-4-5 provides:

> Actual fraud in relation to contracts consists of any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:
>
> (1) The suggestion as a fact of that which is not true by one who does not believe it to be true;
>
> (2) The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believe it to be true;
>
> (3) The suppression of that which is true by one having knowledge or belief of the fact;
>
> (4) A promise made without any intention of performing it; or
>
> (5) Any other act fitted to deceive.
>
> Actual fraud is always a question of fact.

*Treatise on the Law of Contracts* §§ 1523-31 (Walter H.E. Jaeger ed., 3d ed. 1957)).

*See also U.S. Lumber, Inc. v. Fisher*, 523 N.W.2d 87, 89 (S.D. 1994). This election of remedies rule does not prevent plaintiffs from pursuing "alternative remedies so long as no double recovery is awarded." *Ripple v. Wold*, 1996 S.D. 68, ¶ 7, 549 N.W.2d 673, 674-75. We have explained that this rule "should be confined to cases where a plaintiff may be unjustly enriched, or a defendant has been misled, or the result is otherwise inequitable, or res judicata applies." *Id.* ¶ 11, 549 N.W.2d at 676 (citing *Tuchalski v. Moczynski*, 449 N.W.2d 292, 293 (Wis. Ct. App. 1989)). The Eighth Circuit Federal Court of Appeals explained election of remedies as follows:

> Designed to prevent double recovery for a single injury, the election-of-remedies rule applies when a party possesses two appropriate but inconsistent remedies and deliberately pursues one remedy to the other's exclusion. The rule does not prohibit assertion of multiple causes of action, nor does it preclude pursuit of consistent remedies, even to final adjudication, so long as the plaintiff receives but one satisfaction.

*Pa. Nat'l Mut. Cas. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 950-51 (8th Cir. 2004) (citations omitted).

[¶14.] Part of the confusion in this case stems from the fact that liberal pleading standards, combined with a relaxed election-of-remedies approach, allowed plaintiffs to pursue both a contract action seeking contract remedies, including a remedy of rescission, and a tort action based on fraud within the same case. Here, Stablers initially brought both a fraudulent inducement contract claim seeking rescission and a tort claim of fraud and deceit seeking monetary damages.[14]

---

14. Stablers acknowledged at oral argument that they sought monetary damages under the tort claim rather than rescission.

Stablers were granted a partial remedy prior to the jury trial. The trial court granted Stablers' summary judgment motions and dismissed Defendants' counterclaims on the 2002 CREM, stating that the obligations secured by the 2002 CREM were released by virtue of the debt being incorporated into the 2004 Transaction. Under the principles of judicial estoppel, as discussed in paragraph 18, Stablers were thus precluded from arguing that the 2002 CREM was released because it was incorporated into the 2004 Transaction, then later seeking rescission of the 2004 Transaction. The remaining claim for the Plaintiffs was the tortious fraud and deceit claim based on SDCL 20-10-2.

[¶15.] Because the election of remedies rule was triggered when the circuit court granted Plaintiffs' summary judgment motion, releasing underlying obligations in the 2002 CREM, we next consider whether Plaintiffs properly pursued the tort claim regarding the 2004 Transaction, which they were limited to seeking. We believe they appropriately pursued the case as a tort action. Plaintiffs repeatedly stated that they were seeking damages based on the amount of debt wrongfully asserted against them. Additionally, they pursued emotional distress and exemplary damages. Stablers were not suing on the terms of the contract, nor were they seeking contract remedies including rescission, but rather the damages they incurred as a result of the fraud. Therefore, we conclude that this action properly sounded in tort.

[¶16.] Beyers asserts that Stablers identified only four categories of damages that were all dismissed or waived and that they did not receive any damages. "Civil actions founded on negligence or fraud require damages as an essential element."

*Kobbeman v. Oleson*, 1998 S.D. 20, ¶ 6, 574 N.W.2d 633, 635. Beyers asserts that the only categories of damages claimed were (1) emotional distress; (2) payments on discharged debts; (3) damage to property rights and credit reputation; and (4) attorney's fees and punitive damages. The circuit court held that Stablers could not pursue emotional distress damages; Stan and Rose conceded they made no payments on the note and they withdrew the damages to property and credit reputation claim and the claim for attorney's fees. Therefore, Beyers asserts there were no compensatory damage claims from which they could recover and the court should have granted Defendants' motion for summary judgment. Stablers maintain that the wrongful assertion of a debt against Stan and Rose is a loss or harm for which they can recover damages under SDCL 21-1-1[15] and SDCL 20-10-1.[16] There were disputed questions of fact on this issue and, as a result, Defendants were not entitled to summary judgment.

[¶17.] Defendants further counter that the Plaintiffs actually sought and ultimately received rescission because they are "avoiding" the contract. We disagree. Defendants' argument stems in part from the language of a jury instruction which asked the jury to determine if Stan and Rose "are entitled to

---

15. SDCL 21-1-1 provides:

> Every person who suffers detriment from the unlawful act or omission of another may recover from the person in fault a compensation therefor in money, which is called damages. Detriment is a loss or harm suffered in person or property.

16. SDCL 20-10-1 states:

> One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.

avoid paying[.]" While this language read in isolation may seem more suited to a rescission action, the overall tenor of the instructions sounded in tort. Defendants only objected to those parts of the damage instructions that addressed emotional damages and punitive damages. Defendants have waived their right to now assert a further claim of error that the jury was instructed to determine rescission rather than damages.

[¶18.] Defendants also raise a judicial estoppel argument. To determine whether to apply judicial estoppel, we generally consider the following: "'the later position must be clearly inconsistent with the earlier one; the earlier position was judicially accepted, creating the risk of inconsistent legal determinations; and the party taking the inconsistent position would derive an unfair advantage or impose an unfair detriment to the opponent if not estopped.'" *Hayes v. Rosenbaum Signs & Outdoor Adver., Inc.*, 2014 S.D. 64, ¶ 15, 853 N.W.2d 878, 883 (quoting *Canyon Lake Park, L.L.C. v. Loftus Dental, P.C.*, 2005 S.D. 82, ¶ 34, 700 N.W.2d 729, 737). Defendants are correct to assert that Plaintiffs could not affirm the 2004 Transaction, thereby eliminating the 2002 CREM, and simultaneously pursue a rescission action. However, as we explained, no such inconsistent position was taken here. Plaintiffs were within their rights to pursue a fraud claim under tort law.

  b.  *Whether there was an actionable fraud claim.*

[¶19.] "[T]his Court has required that a pleading based on fraud as a basis of recovery of damages must allege all the essential elements of actionable fraud to be sufficient." *N. Am. Truck & Trailer, Inc. v. M.C.I. Commc'n Servs., Inc.*, 2008 S.D.

45, ¶ 8, 751 N.W.2d 710, 713 (quoting *Holy Cross Parish v. Huether*, 308 N.W.2d 575, 576 (S.D. 1981)) . Those elements, which were recited in settled jury instruction No. 22, are:

> That a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage.

*Id.* (quoting *Nw. Realty Co. v. Colling*, 82 S.D. 421, 433, 147 N.W.2d 675, 683 (1966)). Further, we have explained that even where a representation of law was "later determined to be incorrect, no claim of fraud can be maintained on a misrepresentation as to what the law would allow or require." *Sejnoha v. City of Yankton*, 2001 S.D. 22, ¶ 15, 622 N.W.2d 735, 739-40 (citing 37 Am. Jur. 2d *Fraud and Deceit* § 73 (1968)).

[¶20.]     Defendants claim that they should have been granted summary judgment because any misrepresentations were as to law, not fact, and thus did not meet the definition of fraud. The central representation in dispute here is the one to Stan and Rose that $550,000 of the debt within the 2004 Transaction was "Brad's debt" and the rest was Stan's. Whether or not the fraud was actionable based on this representation requires us to resolve whether the representation is one of fact or law. The trial court determined it is primarily one of fact, and we agree.

[¶21.]     The questions of what Beyers represented to Plaintiffs and whether he made those statements—that Stan owed $100,000 of the debt and that Brad owed the rest—with intent to defraud are factual determinations properly sorted out by the jury, and those questions were still disputed before trial. Although Defendants

argue that the misrepresentations made to Stablers are those of law, not actionable as fraud, we disagree. Beyers misrepresented the financial condition of Brad and Brenda.[17] He represented that Brad owed Defendants. Other than the promissory note signed post-bankruptcy, an invalid attempt to reaffirm debt, there were no personal debts owed to the bank after Brad and Brenda's bankruptcy. Therefore, Defendants did not meet their burden to demonstrate the absence of a material fact dispute that would warrant summary judgment.

[¶22.] Further, Defendants argue there is a split of authority on reaffirmation agreements. Therefore, they contend that the representations are ones of law, not fact, and thus there was no actionable fraud. We do not think the law is so unclear as to render Defendants unaware of its application to Defendants' conduct. 11 U.S.C. § 524 (c) states that a reaffirmation agreement is any "agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title[.]" Any claim by Beyers that the consideration to forego foreclosure on liens that passed through bankruptcy is new consideration to which this statute does not apply is unconvincing in the context of this case. There is no indication that any sort of valuation was done on the liens that survived bankruptcy. Instead, Defendants

---

17. *See Stockmen's Livestock Mkt., Inc., v. Nw. Bank of Sioux* City, 135 F.3d 1236, 1239-1240 (8th Cir. 1998) (bank's statements regarding a patron's bank account, that there were outstanding funds on the account, that the account was "satisfactory," that the patron had a revolving line of credit, and that an insufficient check "would be good," were factual misrepresentations of financial condition supporting fraud and deceit claims under South Dakota law).

sought out Stablers to renew all obligations that they owed prior to the bankruptcy, in the same form and amount that Brad and Brenda personally owed pre-bankruptcy. We see no attempt by Defendants to enter into an entirely new arrangement based on the value of the surviving liens. Nor is the mere continuing of a banking relationship sufficient to fulfill the statutory provisions regarding reaffirmation, and Defendants cite no authority for such a proposition.

[¶23.]    Additionally, the main case Defendants cite for the proposition that this agreement was allowed emphasized the voluntary nature of the payments in accordance with 11 U.S.C. § 524(f) and the absence of any coercion on the part of the creditor. *DuBois v. Ford Motor Credit Co.*, 276 F.3d 1019, 1022-23 (8th Cir. 2002). *DuBois* is distinguishable as it involved the debtors initiating contact with the creditor. *Id.* at 1023. The creditor, Ford Motor, agreed to lease the debtors a second car if they paid excess usage fees from a first lease that had been entered into prior to bankruptcy. The collection of the first debt only arose because of the debtors' actions, not those of the creditor to collect or enforce previous amounts owed. *Id.* In this case, at the summary judgment hearing, the court determined that FSB and Beyers pressured Plaintiffs into signing the loan documents, repeatedly seeking them out to sign numerous notes and mortgage additional property in an attempt to reaffirm the discharged debt, negating any voluntariness. Under these facts, it is clear to this Court that Defendants entered into an agreement, "the consideration for which, in whole or in part, [was] based" on discharged debt, and that any agreement to pay was not voluntarily entered into by Plaintiffs. The misrepresentations in this case were not questions of law and could support a fraud

-19-

claim to be decided by a jury.  Therefore, the extent of the debt owed was a question properly submitted to the jury to determine.

> 2. *Whether Stan and Rose should have been allowed to pursue emotional distress damages as part of the fraud and conspiracy claims against Beyers.*

[¶24.]    We have not previously held that plaintiffs may recover emotional distress damages from defendants when asserting fraud.  However,

> We have consistently recognized emotional distress damages in tort actions.  *Roth v. Farner–Bocken Co.*, 2003 S.D. 80, ¶ 70, 667 N.W.2d 651, 670 (upholding a jury award of damages for the feelings of "anger, betrayal, and devastation" in an invasion of privacy action); *Carey v. Jack Rabbit Lines, Inc.*, 309 N.W.2d 824, 827 (S.D. 1981) (upholding a trial court's award of damages in a negligence action as reasonable because "in addition to the painful injury, appellee . . . suffered mental anguish"); *Bean v. Best*, 77 S.D. 433, 441-42, 93 N.W.2d 403, 408 (1958) ("A person who has a cause of action *for a tort* may be entitled to recover as an element of damages for that form of mental distress known as humiliation, that is, a feeling of degradation or inferiority . . . ." (emphasis added) (quoting Restatement (First) of Torts § 905 cmt. d (1939))); *Davis v. Holy Terror Mining Co.*, 20 S.D. 399, 107 N.W. 374, 379 (1906) . . . .

*Fix v. First State Bank of Roscoe*, 2011 S.D. 80, ¶ 14, 807 N.W.2d 612, 617.  While some courts do not allow emotional distress claims for fraud claims, others do. *Compare Walsh v. Ingersoll-Rand Co.*, 656 F.2d 367, 370 (8th Cir. 1981) ("The general rule is that fraud is an economic tort and thus protects only pecuniary losses."), *with Hoffman v. Stamper*, 867 A.2d 276, 297-98 & nn.15-18 (Md. 2005) (collecting cases and noting "[t]here clearly is no universal view").  Plaintiffs did not offer evidence or make an offer of proof in pretrial hearings or at trial to support either intentional or negligent infliction of emotional distress, and the trial court ruled it not allowable as damages.  On these facts, the trial court did not err by denying emotional distress damages.

> 3.    *Whether Stan and Rose's $20,000 exemplary damage verdict should be upheld.*

[¶25.]    SDCL 21-3-2 allows for punitive damages:

> [i]n any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity[.]

The trial court dismissed the punitive damages claim because "[w]e have 'consistently held that punitive damages are not allowed absent an award for compensatory damages.'" *Hoaas*, 2006 S.D. 27, ¶ 18, 714 N.W.2d at 67 (quoting *Schaffer v. Edward D. Jones & Co.*, 521 N.W.2d 921, 928 (S.D. 1994)) (citing *Henry v. Henry*, 2000 S.D. 4, ¶ 5, 604 N.W.2d 285, 288).  Plaintiffs received damages by recovering the amount the jury determined to be an improper debt.  The entire transaction was not undone, or wiped out, as would occur in a rescission action. Evidence was submitted at trial that supports the jury's decision.  The difference between the $650,000 note and damage of $439,100 is equivalent to the 2000 Mortgage (ECAS Loan #45210), in which Stan and Rose guaranteed the loan proceeds to erect a building on their property, and a farm operating note they signed in November 2003.  *See supra* ¶ 5, Transaction 5(ii), 5(vi).  The unique facts of the case mean that no payment is directly made to Stablers, but they still recovered a significant amount.  Therefore, punitive damages were properly submitted to the jury, and the award of $20,000 should be reinstated.[18]

---

18.    This case may seem to conflict with our decision in *Hoaas v. Griffiths*, which the circuit court relied on to determine that Plaintiffs had not received

(continued . . .)

      4.    *Whether the 2004 CREM lapsed because the 2009 addendum was not signed by the mortgagee Beyers.*

[¶26.]      Collateral real estate mortgages are governed by SDCL 44-8-26, which provides that CREMs are valid "for a period of five years from the date of filing and thereafter for a period of sixty days." Further, "[a]n addendum continuing the effectiveness of the collateral real estate mortgage may be filed by the mortgagee within six months before and sixty days after the expiration of the five-year effective date." *Id.* Lastly, "[a]n addendum to a collateral real estate mortgage for the sole purpose of continuing the effectiveness of its lien need be signed only by the mortgagee." *Id.* FSB filed an addendum to the 2004 CREM on February 5, 2009. FSB is the original mortgagee to the 2004 CREM, but by 2009 the CREM had been assigned to Beyers. Therefore, Stablers assert that the current mortgagee did not sign the addendum as required by law. Stan and Rose moved for summary judgment on this issue, and the court held a hearing on July 24, 2012. It held the addendum filed by FSB was sufficient to extend the CREM for an additional five years.

---

( . . . continued)

      compensatory damages. 2006 S.D. 27, 714 N.W.2d 61. We determined that an offset should apply first to compensatory damages awarded rather than an aggregate amount of damages, which included compensatory and punitive. *Id.* at ¶ 17, 714 N.W. 2d 61, 66-7. Both parties in that lawsuit engaged in wrongdoing against the other. The offset resulted in no net recovery because the amount Plaintiff received in compensatory damages was less than the amount he misappropriated from Defendant, leading the Court to conclude that no compensatory damages were awarded that would allow punitive damages. The Court applied equitable principles, which permitted offsets. *Id.* ¶ 20, 714 N.W. 2d at 67-68. We limited our holding to the facts of that case. *Id.* ¶ 23 n.2, 714 N.W. 2d at 68 n.2.

[¶27.]      "Words and phrases in a statute must be given their plain meaning and effect." *Martinmaas v. Engelmann*, 2000 S.D. 85, ¶ 49, 612 N.W.2d 600, 611 (quoting *Moss v. Guttormson*, 1996 S.D. 76, ¶ 10, 551 N.W.2d 14, 17). "Mortgagee" is not statutorily defined for the purposes of SDCL 44-8-26. It is defined, *inter alia,* as "[o]ne that holds a mortgage." *The American Heritage College Dictionary* 888 (3d ed. 1993). In 2009, when FSB filed the addendum extending the CREM, Beyers was the holder of the mortgage. Therefore, under the plain language of the statute, he would have needed to file the addendum to effectively extend the CREM. Beyers failed to file an addendum as required by SDCL 44-8-26, and therefore the CREM lapsed. In support of their argument that the addendum is sufficient to extend the CREM, Defendants cite to *NattyMac Capital LLC v. Pesek*, where we held that a mortgage was extinguished even though a loan servicing agent, rather than the actual mortgagee executed the satisfaction. 2010 S.D. 51, ¶¶ 9-11, 784 N.W.2d 156, 159. However, that case is distinguishable because the agent was authorized to receive payments on behalf of the mortgagee and therefore had the authority to satisfy the mortgage. *Id.* ¶ 17, 784 N.W.2d at 160. There is no evidence that FSB was acting as an agent on behalf of Beyers at the time that it filed an addendum. Defendants also argue that they should be entitled to an equitable lien due to the inadvertent lapse of the CREM. *See Gust v. Peoples & Enderlin State Bank*, 447 N.W.2d 914, 920 (N.D. 1989) ("When a collateral real estate mortgage has inadvertently lapsed . . . , the lender is not completely barred from any remedy. To prevent unjust enrichment of the borrower and to provide restitution to the lender, an equitable remedy should be implied." (citation omitted)). We decline to consider

such an approach, to extend a lien, in this case due to the jury's finding that the CREM was fraudulently procured. Defendants do not have the clean hands necessary to assert an argument on an equitable lien. Further, Beyers has a remedy as he retains rights as a judgment creditor.

> 5. *Whether the 2002 CREM lapsed.*

[¶28.] Pursuant to the circuit court's ruling, which we uphold, the 2004 Transaction satisfied the obligations secured by the 2002 CREM. Therefore, the issue of whether the 2002 CREM lapsed is moot and we do not address it.

*Issues relating to the Ipswich State Bank note*

> 6. *Whether Beyers is a holder in due course of the note.*

[¶29.] Brad and Brenda assert that Beyers knew the ISB note was subject to the defense of discharge in bankruptcy and was illegal; therefore, Beyers cannot enforce the note as a "mere holder." A holder in due course (HDC), as opposed to a holder, is a holder that meets the requirements in SDCL 57A-3-302. Relevant to this case is the requirement that an HDC take the instrument "without notice that any party has a defense or claim in recoupment described in § 57A-3-305(a)." SDCL 57A-3-302(a)(2). However, regardless of a holder's status as an HDC, the holder is subject to the following defenses:

> A defense of the obligor based on (i) infancy of the obligor to the extent it is a defense to a simple contract, (ii) duress, lack of legal capacity, or *illegality of the transaction* which, under other law, nullifies the obligation of the obligor, (iii) fraud that *induced the obligor to sign the instrument* with neither knowledge nor reasonable opportunity to learn of its character or its essential terms, *or (iv) discharge of the obligor in insolvency proceedings*[.]

SDCL 57A-3-305(a)(1) (emphasis added); SDCL 57A-3-305(b) ("The right of a holder in due course to enforce the obligation of a party to pay the instrument is subject to defenses of the obligor stated in subsection (a)(1) . . . ."). Stablers have only asserted defenses within SDCL 57A-3-305(a)(1). Accordingly, Beyers status as a holder or holder in due course is irrelevant. Regardless, if Stablers prove a defense exists under SDCL 57A-3-305(a)(1), Beyers is subject to it. Therefore, because it does not impact Stablers' argument, we will not address whether Beyers is or is not an HDC. Instead, we focus on whether or not Stablers established a defense which would prevent Beyers from enforcing the note.

[¶30.]        Stablers have not established that a defense under SDCL 57A-3-305(a)(1) exists. The circuit court correctly determined that ISB was not a holder of a claim in Brad and Brenda's bankruptcy. Therefore, the reaffirmation requirements did not apply to them, and the instrument was valid. Additionally, the instrument arose post-bankruptcy, and is not one that was itself discharged in a later bankruptcy proceeding. Further, the circuit court found no evidence of duress or fraud on the part of ISB in procuring the note. Likewise, we see no evidence of any such conduct and do not find the court was clearly erroneous in its determinations.

> 7.    *Whether Beyers and FSB are entitled to their attorney's fees and costs for work done in bankruptcy court.*

[¶31.]        After the circuit court determined that Beyers was entitled to enforce the ISB note, it also granted Beyers attorney's fees that he incurred in resisting Brad and Brenda's efforts to prevent enforcement in bankruptcy court. Plaintiffs

stipulated at the court trial on January 24, 2013, that they would pay those fees in the event that the court found the obligation enforceable.[19] The court noted this stipulation and awarded fees accordingly. Plaintiffs now assert that the ISB note did not authorize fees in this case because it only allows attorney's fees in those instances where the Bankruptcy Code allows them. Further, they allege that the Bankruptcy Code would not allow fees in this instance as it only allows a creditor to recover attorney's fees under 11 U.S.C. § 506(b), which is inapplicable to this case.

[¶32.]     "[P]arties by their stipulations may in many ways make the law for any legal proceeding to which they are parties, which not only binds them, but which the courts are bound to enforce. They may stipulate away statutory, and even constitutional rights." *Gerlach v. State*, 2008 S.D. 25, ¶ 11, 747 N.W.2d 662, 666 (quoting *In re Malloy's Estate*, 17 N.E.2d 108, 109 (N.Y. 1938)). "Stipulations are typically upheld, unless the 'usual rule of exclusion thereby suspended were one

---

19.     **Defense counsel:** "[Plaintiff's counsel] and I discussed, and I believe the parties have agreed, that in the event the First State Bank the [sic] Roscoe – in the event that the defendants prevail on the Ipswich State Bank issue and it's found that that amount is owed, they're entitled to attorney's fees and costs."

**Plaintiffs' counsel:** "That's correct."

**Court:** "Okay. Say that one more time for me."

**Defense counsel:** "All right. In the event that the defendants prevail with regard to the enforceability of the Ipswich State Bank transaction and Brad and Brenda Stabler's rescission claim, if the bank and Mr. – if the defendants prevail, then they're entitled to their attorney's fees and costs in addition to the amount that the parties stipulated."

**Court:** "Okay. And that's because of terms in the, in the loan documents."

**Defense counsel:** "There are terms in the loan documents that require payment."

**Court:** "Okay."

affecting a specific third person's interests or affecting vital general policies independent of the contracting parties.'" *Id.* ¶ 12, 747 N.W.2d at 666 (quoting 1 John H. Wigmore, *Evidence in Trials at Common Law* § 7a (Tillers rev. 1983)). We do not find any "'vital' general policy that would forbid the parties' stipulation in this case." *Id.* Any dispute the parties had regarding the language of the contract should have been presented to the circuit court prior to the parties agreeing on what the contract entitled Defendant to receive. Plaintiffs had their chance to object, but specifically agreed that the terms of the contract granted Defendant's attorney fees if they prevailed. Therefore, we decline to address an argument regarding those terms for the first time on appeal.

> 8. *Whether Defendants are entitled to a new trial.*
>
>> a. *Whether a new trial is warranted under SDCL 15-6-59(a)(3) and (a)(4).*

[¶33.] Beyers and FSB are asserting that they have a right to a new trial under SDCL 15-6-59(a)(3) because the jury verdict was obtained through false opinion testimony and Stan and Rose presented a new theory of fraud. SDCL 15-6-59(a) provides that "[a] new trial may be granted to all or any of the parties and on all or part of the issues for . . . (3) [a]ccident or surprise which ordinary prudence could not have guarded against; [and] (4) [n]ewly discovered evidence, material to the party making the application, which he could not with reasonable diligence have discovered and produced at the trial[.]"

>> i. *Whether Defendants are entitled to a new trial because of false testimony.*

[¶34.]     As we have explained,

> If the court believes that the testimony given by a material witness was false, that without such false testimony the jury might reach a different conclusion, and that the party seeking a new trial was taken by surprise by the false testimony or did not learn of its falsity until after trial, then it would be the duty of the court to set aside the verdict and grant a new trial.

*Pickering v. State*, 260 N.W.2d 234, 235 (S.D. 1977). Defendants maintain Tom Holdhusen, a banker with ISB who Beyers had dealt with when arranging the ISB note, lied at the trial. Plaintiffs' counsel asked Holdhusen during the jury trial if he had ever moved debt off the books of ISB so that regulators could not see it. He responded that he had "not in the manner this was done, no[,]" because he "didn't feel it was probably appropriate." Counsel asked "[i]t wouldn't be ethical to you, right?" Holdhusen responded, "[r]ight." In light of Holdhusen's later testimony at a court trial where he stated that there was nothing unethical about Beyer's conduct, Defendants equate Holdhusen's statement at the jury trial with false testimony that Beyers acted unethically when moving debt off the books. However, his answers at the jury trial were in response only to questions about his own conduct regarding moving debt off books at his bank. Further, defense counsel never asked Holdhusen at the later court proceeding whether he would move debt off his own books, and therefore counsel did not establish that he was lying when testifying that he would not do what Beyers had. Regardless, we do not think his statement about not moving debt off his books is testimony without which the jury would have reached a different conclusion.

        ii.   *Whether Defendants are entitled to a new trial because Plaintiffs presented a new theory of fraud.*

[¶35.]     Defendants also believe Stablers testified to a new theory of fraud at trial. Stablers asserted throughout the trial preparation that Beyers told Stan and Rose that the $650,000 note was comprised of debt owed by Stan and Brad. Now Defendants contend that Stan and Rose presented a new theory because Stan testified, "I was told by John Beyers personally that I owed $100,000 and the $550,000 was Brad's." Defendants equate this statement to a new theory and argue surprise. However, we are not convinced. Plaintiffs included this information, delineation of the amount owed by each individual, in their response to Defendants' statement of undisputed material facts in support of motions for summary judgment on October 24, 2012. Plaintiffs specifically stated Stan believed $100,000 was his debt and the rest was Brad's and cited to Stan's deposition for this proposition. We fail to see how Stan's testimony at trial is an entirely new theory or such a surprise that it warrants a new trial.

> b.     *Whether Defendants are entitled to a new trial under SDCL 15-6-59(a)(7).*

[¶36.]     Defendants also assert that they are entitled to a new trial under SDCL 15-6-59(a)(7), which provides:

> A new trial may be granted to all or any of the parties and on all or part of the issues for [an] . . . [e]rror of law occurring at the trial; provided, that in the case of claim of error, admission, rejection of evidence, or instructions to the jury or failure of the court to make a finding or conclusion upon a material issue which had not been proposed or requested, it must be based upon an objection, offer of proof or a motion to strike.

"We have repeatedly stated that a trial court's evidentiary rulings are presumed correct and will not be overturned absent a clear abuse of discretion. An abuse of discretion refers to a discretion exercised to an 'end or purpose not justified by, and

clearly against reason and evidence.'" *St. John v. Peterson*, 2011 S.D. 58, ¶ 18, 804 N.W.2d 71, 76 (quoting *Kostel v. Schwartz*, 2008 S.D. 85, ¶ 12, 756 N.W.2d 363, 370). We employ a two-step process for reviewing evidentiary rulings. First, we "determine whether the trial court abused its discretion in making an evidentiary ruling." *Ruschenberg v. Eliason*, 2014 S.D. 42, ¶ 23, 850 N.W.2d 810, 817 (quoting *Supreme Pork, Inc. v. Master Blaster, Inc.*, 2009 S.D. 20, ¶ 59, 764 N.W.2d 474, 491). "[S]econd, we determine 'whether this error was a *prejudicial error* that in all probability' affected the jury's conclusion." *Id.* (quoting *Supreme Pork*, 2009 S.D. 20, ¶ 59, 764 N.W.2d at 491). Defendants offer a variety of reasons they believe a new trial is warranted. We do not find that the trial court abused its discretion on any of the rulings.

*Whether the court improperly instructed the jury regarding punitive damages.*

[¶37.]        "We review a trial court's decision to submit punitive damages to the jury under a clearly erroneous standard." *Hoaas*, 2006 S.D. 27, ¶ 16, 714 N.W.2d at 66 (citing *Kieser v. Se. Props.*, 1997 S.D. 87, ¶ 27, 566 N.W.2d 833, 839-40). "In order for the issue of punitive damages to be submitted to the jury, the proponent of those damages must establish by clear and convincing evidence that there is a reasonable basis to believe that a party's conduct was willful, wanton, or malicious." *Id.* Defendants assert that because compensatory damages were not possible, the decision to submit the exemplary damages was not proper and allowed Plaintiffs' counsel to present evidence of wealth to convince the jury that Defendants had the ability to pay. As we previously explained, this is a tort action for damages,

compensatory damages were awarded, and therefore punitive damages may be considered.

## Conclusion

[¶38.]        As a result, the question of fraud was properly submitted to the jury in this case as the representations regarding the 2004 Transaction's note and CREM were questions of fact.  Plaintiffs pursued a tort claim on the 2004 Transaction, and Defendants are not entitled to a new trial.  Stan and Rose are entitled to the exemplary damages the jury awarded.  We reverse the trial court's decision that a prior mortgagee that no longer holds any interest in a collateral real estate mortgage may file an addendum for the current mortgagee.  Thus, the 2004 CREM did lapse for failure of the mortgagee, Beyers, to file an addendum.  Finally, the trial court properly enforced the Ipswich State Bank note and awarded attorney's fees appropriately.  We remand to the circuit court to enter judgment consistent with this opinion.

[¶39.]        GILBERTSON, Chief Justice, KONENKAMP and MEIERHENRY, Retired Justices, concur.

[¶40.]        ZINTER, Justice, concurs in part, concurs in result in part, and dissents in part.

[¶41.]        MEIERHENRY, Retired Justice, sitting for WILBUR, Justice, disqualified.

[¶42.]        KERN, Justice, not having been a member of the Court at the time this action was assigned to the Court, did not participate.

ZINTER, Justice (concurring in part, concurring in result in part, and dissenting in part).

[¶43.] I join the opinion of the Court on all but two issues. I concur in result on that portion of Issue 1a. discussing Stablers' alternative remedies of rescission versus compensatory damages. I dissent on Issue 3 (punitive damages). The circuit court's vacation of punitive damages should be affirmed under well-established law.

*Issue 1a: Rescission v. Compensatory Damages*

[¶44.] Stan and Rose Stabler made a tactical decision to elect money damages as their remedy. They did so by affirming the validity of the 2004 note and CREM in order to obtain dismissals of Beyers' counterclaims on the 2000 and 2002 notes/mortgages. The circuit court adopted Stablers' position and dismissed the counterclaims. The circuit court ruled that the 2004 note and CREM discharged the earlier notes/mortgages. Therefore, the circuit court ruled that Stablers could not rescind the 2004 note and CREM: Stablers were limited to seeking damages at trial. *See supra* ¶ 9. This Court agrees, correctly concluding that Stablers were judicially estopped from thereafter "seeking rescission of the 2004 Transaction." *See supra* ¶¶ 14-15. Stablers were relegated to seeking compensatory damages in tort for fraud in the inducement.

[¶45.] Following the circuit court's dismissals of the counterclaims, Stablers apparently acknowledged their election because they repeatedly "*stated* that they were seeking damages." *See supra* ¶ 15 (emphasis added). When pressed to identify the fraud damages they would seek, they identified four categories of compensatory damages for trial: (1) emotional distress, (2) payments on discharged debts, (3) damage to property rights and credit reputation, and (4) attorney's fees

and punitive damages. Considering damage categories (1) through (3), I agree with the Court that Beyers was not entitled to summary judgment. Stablers were entitled to attempt to prove that they had sustained one of those categories of compensatory damages.

[¶46.] But Stablers did not follow through and prove any of those damages at trial. The emotional distress claim did not go to the jury, Stablers conceded they made no payments on the note, and Stablers withdrew their claim for damages to property rights and credit reputation. Further, the request for punitive damages was not a stand-alone, compensatory-damage claim. It was awardable only if Stablers recovered other compensatory damages. *See Hoaas v. Griffiths*, 2006 S.D. 27, ¶ 18, 714 N.W.2d 61, 67. Finally, Stablers withdrew their claim for attorney's fees. *See supra* ¶ 16.

[¶47.] Therefore, I disagree that Stablers actually "pursued the case as a tort action" for compensatory damages. *See supra* ¶¶ 15, 17. On the contrary, Stablers sought rescission at trial; i.e., they sought to avoid enforcement of all or the part of the $650,000 note that was induced by fraud. "A rescission is an avoidance of a transaction . . . . Rescission . . . refers to the avoidance of the transaction or the calling off of the deal . . . ." Dan B. Dobbs, *Handbook on the Law of Remedies: Damages-Equity-Restitution* § 4.3, at 254 (1st ed. 1973). On the other hand, the term "damages" is defined as "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury[.]" *Black's Law Dictionary* 471 (10th ed. 2014). Here, Stablers did not obtain a judgment awarding money: Beyers did. Stablers sought and obtained the equitable remedy of rescission to avoid paying part of the

note and mortgage. This Court agrees that Stablers' judgment "declar[ed] [the] $439,100 uncollectible." *See supra* ¶ 9.

[¶48.] Stablers also continued to seek avoidance of the debt after trial. In post-trial motions, they argued that the entire debt should be declared unenforceable because of the fraud. One of Stablers' proposed judgments would have rendered the entire $650,000 mortgage and note unenforceable. In ruling on the post-trial matters, the circuit court recognized that the jury had not awarded money damages. The court set aside the punitive damage verdict because Stablers recovered no underlying "damages." This record clearly reflects that Stablers did not actually pursue their fraud claim as a tort action and recover money damages. Indeed, as is explained below, the *only* judgment entered on the 2004 transaction was a money judgment against Stablers in favor of Beyers for the amount of principal and interest remaining after the court deducted the amount the jury found Stablers could "avoid paying."

[¶49.] I also disagree that the "overall tenor of the [jury] instructions sounded in tort." *See supra* ¶ 17. On the contrary, no instruction was given telling the jury how to calculate any type of tort damage. The only remedy instruction given was an instruction on rescission. Instruction No. 12 stated Stablers had to prove that the $650,000 note and mortgage were obtained through fraud and if they did, "that Stan and Rose Stabler are entitled to *avoid paying* the Defendants *on some or all of the note*, and are entitled to *avoid the effects* of the mortgage *in whole or in part*." Avoidance of an obligation is the quintessential hallmark of rescission. *See* Dobbs, *supra* ¶ 47, § 4.3, at 254-55. In sum, although Stablers argue otherwise, the jury was

instructed and the judgment was entered for rescission: the partial avoidance of paying Beyers on his counterclaim to recover under the 2004 note and CREM. As a consequence, Stablers improperly pursued inconsistent remedies by affirming the 2004 note and CREM to discharge the pre-fraud 2000 and 2002 notes/mortgages in pretrial proceedings, and later seeking rescission of the 2004 note and CREM before the jury.

[¶50.]     Nevertheless, I concur in result on this issue. Instruction 12 was submitted to the jury without objection. Therefore, the instruction on rescission became the law of the case, and the Defendants' motion for new trial has not been preserved on this issue. *See Alvine Family Ltd. P'ship v. Hagemann*, 2010 S.D. 28, ¶ 20, 780 N.W.2d 507, 514; *State v. Hage*, 532 N.W.2d 406, 412 (S.D. 1995).

*Issue 3: Exemplary damages*

[¶51.]     The circuit court set aside the $20,000 punitive damage award because Stablers did not recover "damages." I would affirm that ruling because, as explained above, Stablers recovered no compensatory damages in tort. Alternatively, even if one agrees that Stablers obtained a judgment against Beyers for compensatory damages—an assertion contradicted by the judgment—Stablers failed to obtain a *net* recovery. Therefore, punitive damages were not awardable under well-established law.

[¶52.]     Although the judgment relating to the 2004 transaction awarded Stablers no money, the majority contends that Stablers recovered a "significant amount." *See supra* ¶ 24. But the language of the judgment belies this contention. The judgment was entered for $356,776.72 "in favor of John K. Beyers *against* Stan

and Rose Marie Stabler." (Emphasis added.) That amount represented the principal and prejudgment interest Stablers still owed Beyers on the 2004 note less the $439,100 that the jury, under the language of Instruction 12, found Stablers could "avoid paying" because it was procured by fraud.[20] Thus, the circuit court correctly ruled that Stan and Rose received no "actual compensatory payment" under the judgment. Circuit Court's July 8, 2013 Memorandum Decision at 9.

[¶53.] The law in such cases is well settled. "We have 'consistently held that punitive damages are not allowed absent an award for compensatory damages.'" *Hoaas*, ¶ 18, 714 N.W.2d at 67 (quoting *Schaffer v. Edward D. Jones & Co.*, 521 N.W.2d 921, 928 (S.D. 1994)). Because the judgment awarded Stablers no money, they may not recover punitive damages. *See id.* Additionally, where parties recover claims against each other that are "intertwined"—i.e., arising from the "same transaction"—the claims must be offset to determine whether there is a net recovery. *Id.* ¶¶ 22-23, 714 N.W.2d at 68. Unless a punitive-damage claimant obtains a net recovery of compensatory damages, he "cannot be awarded punitive damages." *Id.* ¶ 23.

[¶54.] In this case, the parties' claims were intertwined. In its memorandum opinion, the circuit court indicated that it allowed the punitive damage claim to go to the jury only because when the case began, there were many competing claims

---

20. The central issue at trial was Beyers' counterclaim seeking enforcement of the $650,000 note. Under jury instruction 12, the jury determined that Stan and Rose were entitled to "avoid paying" $439,100 of the debt because of Beyers' fraud. After the trial, the court entered judgment against Stablers for the remaining $210,900. With prejudgment interest, the judgment against Stablers totaled $356,766.72.

and it could not be determined who would ultimately prevail. The court further indicated that after the claims had narrowed because of court rulings and the jury verdict, there were offsetting claims and Stablers did not obtain a net recovery. Therefore, one may, for the purpose of argument, agree with today's majority that the judgment—allowing Stablers to avoid paying part of the note—was a judgment recovering tort damages. *See supra* ¶ 24. Yet, Stablers may not recover punitive damages because there is no dispute that they did not obtain a net recovery. *See Hoaas*, 2006 S.D. 27, ¶ 18, 714 N.W.2d at 67.[21] Because Stablers obtained no net recovery, the circuit court correctly set aside the punitive damage award.[22]

---

21.    The majority argues that *Hoaas* is confined to its facts, *see supra* ¶ 24 n.18. But the facts in both cases are analogous, and *Hoaas* specifically delineated the type of case in which *Hoaas* would not apply. "Under a different set of facts, an offset may involve a transaction which is independent of a plaintiff's claims and, consequently, may not affect entitlement to punitive damages." *Hoaas*, 2006 S.D. 27, ¶ 23 n.2, 714 N.W.2d at 68 n.2. Here, Beyers' claim is not independent of Stablers'. Both claims are intertwined in the 2004 transaction. Therefore, even if Stablers did recover "compensatory damages," as the majority concludes, Stablers can recover no punitive damages "[b]ecause the setoff negates [their] compensatory damages," and they received no recovery. *Id.* ¶ 24, 714 N.W.2d at 68.

22.    Defendants were not, however, entitled to prevail on their motion for a new trial alleging that allowing punitive damage evidence prejudiced their case and should not have been admitted at trial. *See supra* ¶ 37, issue 8b. As the circuit court noted, it was not known who would prevail on various claims and defenses until the jury reached its verdict. Considering the procedural history of this case, the court did not abuse its discretion in admitting such evidence.